

**ORDERED in the Southern District of Florida on November 16, 2006.**

*/s/ Robert A. Mark*

**Robert A. Mark, Judge**
**United States Bankruptcy Court**

___

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| In re | Case No. 03-43619-BKC-RAM |
| | Chapter 11 |
| OCEAN CLUB SERVICES, LLC, | |
| | (Jointly Administered) |
| Debtor. | |
| | |
| In re | Case No. 03-43627-BKC-RAM |
| | Chapter 11 |
| MAGIC CRUISE LINE SERVICES CO., | |
| Debtor. | |
| | |
| In re | Case No. 03-43629-BKC-RAM |
| | Chapter 11 |
| ALBERTA TRADING CO., | |
| Debtor. | |

**ORDER GRANTING DEBTORS' MOTION FOR**
**SUMMARY JUDGMENT AND DISALLOWING MARITIME LIEN CLAIMS**

The Debtors, Alberta Trading Co. ("Alberta Trading"), Magic Cruise Line Services Co. ("Magic Cruise Line") and Ocean Club Services, LLC ("Ocean Club Services") (collectively, the "Debtors"), filed their Amended Objection to Claims ("Objection") (C.P. # 239), including objections to two proofs of claim filed by Straight A Tours, Inc. ("Straight A"). Resolving the Debtor's Objection with respect to Straight A requires the Court to determine whether Straight A has established a maritime lien claim against the proceeds derived from the sale of the Debtors' vessel. For the reasons that follow, the Court finds that Straight A's claims are unsecured, not secured by a maritime lien attaching to the proceeds from the sale. Therefore, the Objection will be sustained.

I.      Factual Background

Alberta Trading, which wholly owns Magic Cruise Line, which in turn wholly owns Ocean Club Services, owned, until its sale in these bankruptcy proceedings, the passenger vessel *The Mirage I*. Alberta Trading chartered *The Mirage I* to Magic Cruise Line, and Ocean Club Services provided operations and management. Collectively, the Debtors operated *The Mirage I* on passenger cruises to destinations such as Cancun, Mexico.

By the Fall of 2003, the Debtors were in dire financial straights. The ship mortgage on *The Mirage I* was in default, and the Debtors were in arrears with many, if not all, of their creditors. These creditors included maritime lien creditors, including crew wage claimants, personal injury claimaints and claimants who supplied "necessaries." Thus, in the Fall 2003, numerous creditors had the power to arrest *The Mirage I* on account of their unpaid claims.

In October 2003, the Debtors contracted with Straight A, an operator of student tours, booking *The Mirage I* for cruises on more than forty dates in 2004 for specific numbers of

2

passengers. Straight A paid to Magic Cruise Line aggregate deposits of $212,000 for the bookings. Straight A's contemplated passengers, however, never boarded *The Mirage I* nor were the projected cruises ever undertaken because of the intervening bankruptcies of the Debtors.

The Debtors individually petitioned for Chapter 11 protection on December 31, 2003, on the eve of the arrest of *The Mirage I*, and, on January 20, 2004, this Court entered an order providing for the joint administration of the individual cases. The Debtors sought, and were granted, authority to sell *The Mirage I* at auction with liens to attach to the proceeds of the sale, culminating in this Court's Final Order Approving Sale of Vessel and Related Assets (C.P. # 67) on March 22, 2004 approving the sale of The Mirage I for $8,050,000.00. Thereafter, this Court has presided over several adversary proceedings and contested matters to determine the amount and validity of lien claims against the sale proceeds.

II.     Procedural Background

On July 10, 2006, the Court conducted a hearing on the Debtors' Motion for Summary Judgment (C.P. # 518) on the Debtors' Objection to two claims filed by Straight A Tours, Inc. ("Straight A"). Specifically, the Debtors object to Claim No. 72 filed by Straight A as a secured claim against Ocean Club Services; they seek to strike its status as a secured claim and to allow it as a general unsecured claim. Debtors object to Straight A's Claim No. 44 against Alberta Trading in its entirety. Straight A filed a Response (C.P. # 534) in which it contends its claims are secured by a preferred maritime lien arising out of the tort of financial unseaworthiness.

III.   Discussion

   A.   Introduction

Straight A can survive the Motion for Summary Judgment only if it can show its claims are secured by a preferred maritime lien. This follows from the fact that *The Mirage I*'s mortgagee, Bank Leumi Le-Israel, B.M., holds a preferred ship mortgage, which under the Ship Mortgage Act, 46 U.S.C. §§ 31301-43, has priority over all claims not secured by a preferred maritime lien, and that the principal amount of the mortgage exceeds the amount of those proceeds from the sale of *The Mirage I*. Straight A argues that it holds a preferred maritime lien arising out of a maritime tort. The maritime tort alleged is financial unseaworthiness which Straight A argues was committed by the Debtors when they accepted from Straight A deposits for cruises the Debtors knew they would not be able to perform given the Debtors' dire financial condition at the time.

For the theory of financial unseaworthiness, Straight A principally relies on three cases: Associated Metals & Minerals Corp. v. Alexander's Unity MV, 41 F.3d 1007 (5th Cir. 1995), Morrisey v. S.S. A. & J. Faith, 252 F. Supp. 54 (N.D. Ohio 1965), and The Henry W. Breyer, 17 F.2d 423 (D. Md. 1927). As discussed below, even assuming that Straight A could establish a tort claim against one or more of the Debtors, the Court holds that Straight A cannot invoke the prerequisite admiralty jurisdiction necessary for that tort claim to give rise to a maritime lien. Moreover, it cannot prove one of the elements required to make a claim for financial unseaworthiness. Finally, even if Straight A could prove any tort claim against one or more of the Debtors, under these facts its claim would not be secured by a maritime lien. Thus, as a matter of law Straight A's claims are unsecured.

B.  Standard for Summary Judgment.

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)).  Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits.  Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. Id. at 322-23.

C.  Admiralty Jurisdiction

Admiralty jurisdiction arises if an alleged tort occurred in a maritime locale (the locality requirement) and there was a relationship between the tort and a maritime activity (the nexus requirement). East River Steamship v. Transamerica Delaval, 476 U.S. 858, 863-64 (1986).  Here the nexus requirement is clearly met.  The locality requirement, however, is not.

An alleged tort satisfies the locality requirement only if it occurs or has effects on navigable water. Wilkins v. Commercial Investment Trust Corp., 153 F.3d 1273 (11th Cir. 1998).  The cases relied upon by Straight A, Breyer, Faith and Associated Metals, which are more fully described below, are inapposite for purposes of establishing admiralty jurisdiction.  In those cases the requirement that the tort occurs or has effect on navigable waters was satisfied because the cargo was

loaded on board the vessel. Here, the passengers never boarded the vessel. Moreover, Straight A has made no other allegation that any element of the tort of financial unseaworthiness was committed on navigable water. The import of this is that the admiralty jurisdiction, which is prerequisite to asserting a maritime lien, is absent, and Straight A's efforts to assert a maritime lien necessarily fail. Although the analysis could end here, further discussion is appropriate since even if admiralty jurisdiction exists, Straight A cannot establish a tort claim for financial unseaworthiness. Moreover, even if a tort claim could be established, it would not give rise to a maritime lien against the vessel.

      D.      Financial Unseaworthiness

Though not using the phrase "financial unseaworthiness," In re The Henry W. Breyer, 17 F.2d 423 (D. Md. 1927) seems to be the genesis of the doctrine. In that case, the ship was seized upon a libel for crew's wages. It was sold at auction for an amount substantially less than the outstanding principal amount of the preferred mortgage to which the ship was subject. Several claimants argued that they held preferred maritime liens.

Among these claimants were certain cargo owners who had engaged the vessel to carry cargo from Baltimore to Miami. The freight was prepaid, and the cargo was loaded onto the vessel in Baltimore. At the time the vessel took on these goods, her owners were significantly in arrears on the ship's mortgage and were about to miss another payment. There were also outstanding debts for crew's wages, supplies and repair services. After she was seized, the cargo owners were able to arrange for a third party to ship the goods on the same terms as with the original vessel. The goods were undamaged. Thus, the losses of the cargo owners were limited to the prepaid freight.

The court found that the cargo owners held preferred maritime liens. The court relied upon alternative theories to find the predicate tort. First, the court reasoned that a preferred maritime lien

arose by virtue of the vessel's complete failure to transport the cargo. The court recognized that the shippers did have a contract cause of action arising from this failure. However, the court found that by virtue of the common carrier relationship, there existed "a duty imposed by law which arises out of the relations which the carrier sustains to the public," *i.e.*, failure to ship the cargo once on board violated this "duty imposed by law" giving rise to a cause of action sounding in tort. The court found that the ship's failure to transport the goods arose from its owner's financial inability to reasonably furnish the ship and that the cargo owners "were entitled to recover the prepaid freight in an action of negligence." Id. at 431.

The court also relied upon an alternative "constructive fraud" theory. The court reasoned that "[i]t is a general principle that, when a person who is insolvent purchases goods with no intention of paying for them, and conceals his insolvency and his intention not to pay, he is guilty of fraud which entitles the vendor to recover the goods. Knowledge of inability to pay when the purchase is made is equivalent to purchase with intent not to pay. Such purpose is constructively fraudulent." Id. Here, the financial inability of the ship's owner was so complete, that insolvency must have been known to the "managers of the vessel when the cargo was taken on board." Id. Accepting the prepaid freight and loading the goods when it was clear that the owners could not fund the voyage was constructively fraudulent. The court concluded that "[i]t was equally fraudulent for the ship to accept payment for services which she was clearly unable to perform." Id.

In Morrisey v. S.S. A. & J. Faith, 252 F.Supp. 54 (N.D. Ohio 1965), the court analyzed similar facts. Although the cargo owners pressed both the "negligence" and "constructive fraud" theories articulated in Breyer, the court only analyzed the "negligence" theory. The court framed the issue as "whether the act of accepting cargo and freight charges and lifting anchor when the ship is in

7

precarious financial straits can be construed as a failure to use due diligence to furnish a seaworthy vessel." Id. at 58. The court reasoned that the term "seaworthy" should not be limited to its denotation, *i.e.*, the seaworthiness analysis requires more than an inquiry into its "physical facilities." Rather, carrying on the tradition of expanding the "connotative ambit" of the term, the court concluded that the duty to provide a seaworthy vessel "impose[d] the obligation so that a ship's owner must make reasonable effort to furnish a vessel which can complete the voyage for which she solicits business." Id. Conversely, the duty of seaworthiness is breached when

> there is a multitude of unsatisfied creditors, any one of whom can arrest the vessel, and the owner lacks the resources to free her from the arrest of process – either by satisfaction of the claims or the posting of a bond – there can be no reasonable expectation that the vessel will perform the voyage.

Id. Thus, the duty to provide a seaworthy vessel is breached when the financial status of the ship's owners is such that interruption or termination of the voyage is foreseeable. Since the vessel was "already floundering on the shoals of hopeless insolvency" when it took on the cargo, the vessel's owners breached the duty to provide a seaworthy vessel.

The court then turned to the question of whether the failure to provide a seaworthy vessel was a tort. In answering this question in the affirmative, the court reasoned that a common carrier's duty to provide a seaworthy vessel independently existed under the law. It was an additional safeguard to those negotiated by the parties in the contract for affreightment or bill of lading. A breach of this additional, independent duty, the court concluded, gives rise to cause of action in tort. Thus, the court held that accepting the prepaid freight and loading the cargo on an unseaworthy vessel gave rise to a maritime tort, and it award a preferred maritime lien in the amount of the prepaid freight.

In <u>Associated Metals and Minerals Corp. v. Alexander's Unity MV</u>, 41 F.3d 1007 (5th Cir. 1995), the Alexander's Unity took on a cargo of steel plates that were susceptible to seawater rust damage for transport from India to Mobile and Houston. Because the Alexander's Unity's hatch covers had fallen into disrepair and because of the stormy and tumultuous seas surrounding the Cape of Good Hope, the ship's master requested permission from the vessel's owner to travel through the Suez Canal. The vessel's owner was unwilling to pay the fees necessary for passage through the Canal and denied the request. Moreover, the owner declined to replace the hatches and instead merely patched them with "asphalt tape." While rounding the Cape, the ship encountered conditions so severe that the ship's deck was covered by waves for several days. Seawater penetrated through the hatch cover and into the cargo holds, resulting in more than $700,000 of rust damage to the steel plates. The initial leg of the Alexander's Unity voyage took it to New Orleans from which it was supposed to continue and deliver the steel plates to Mobile and Houston. The ship, however, was arrested in New Orleans by the ship's mortgagee. The cargo owner incurred an additional $70,889.95 in expenses resulting from the forwarding of the steel plates.

The cargo owner sued seeking damages for the rust damage to the cargo and for expenses incurred in forwarding the cargo. The district court held that the cargo owner was "damaged not only from the breach of contract of carriage by the vessel but also from the physical and financial unseaworthiness of the vessel and the negligence of her owners." <u>Id.</u> at 1010. Thus, under admiralty law, the cargo owner held "a claim in tort for negligence and such a claim is a preferred maritime tort lien against the vessel" which encompassed the rust damage as well as forwarding expenses. <u>Id.</u> On appeal, the Fifth Circuit affirmed. It did not examine the substance of financial unseaworthiness. Rather, its analysis focused on whether the lien the cargo owner held on account of "physical and

9

financial unseaworthiness" arose out of a maritime tort. The Fifth Circuit held that at least since The John G. Stevens, 170 U.S. 113 (1898), such claims had sounded in both contract and tort, which the Fifth Circuit described as a "hybrid" claim, and that subsequent developments in the law had not eliminated the tort. Id. at 1011 - 17.

Taken together, these cases can be read to develop the "negligence" theory articulated in Breyer into a cause of action for financial unseaworthiness. Although, as noted above, Associated Metals did not delve into the substance of financial unseaworthiness, it can be construed as placing the Fifth Circuit's imprimatur on the concept. The material facts in each of the three cases are identical: under some contractual aegis, freight is prepaid, cargo is loaded on board the vessel while the financial condition of the vessel's owner or charterer is such that it is foreseeable that she will not complete the intended voyage, and, in fact, the intended voyage is not completed. Generalizing from these facts and employing the language of Breyer and Faith, the elements of the tort of financial unseaworthiness appear to be (1) a duty to provide a seaworthy vessel, (2) foreseeable termination or interruption of the intended voyage due to the financial condition of the vessel's owners, (3) actual termination or interruption resulting from the financial condition, and (4) damages, commonly the loss of prepaid freight. Moreover, following Associated Metals, financial unseaworthiness does sound in tort.

The facts of the instant case, however, are distinguishable from those in Breyer, Faith and Associated Metals because the passengers, which Straight A seeks to analogize to the cargo in the above cases, never boarded the vessel. The import of this factual distinction is that the duty of seaworthiness never arises. Todd Shipyards Corp. v. City of Athens, 83 F. Supp. 67 (D. Md. 1949). In that case, which presented nearly identical facts to the instant case, the court relied on this

10

distinction and denied maritime lien status to passengers who never boarded their intended passenger vessel.

In Todd Shipyards, the vessel was arrested following a libel entered by the shipyard that had renovated the vessel. The vessel had been a troop transport and by the efforts of the shipyard was converted to a passenger and cargo transport. The cost of the renovation, however, evidently exceeded the vessel's owner's capital. Although the vessel did make several voyages, it appears that the owner had little realistic chance of repaying the shipyard. Indeed, when the vessel was finally arrested, libels were also entered for unpaid crew wages for some preceding voyages. Among the other libels were those for passengers who had prepaid for tickets on the projected next voyage. No passenger ever boarded the vessel nor was any passenger's baggage loaded on board.

The court held that the passengers' claims for prepaid tickets were not secured by maritime liens. The court specifically considered whether under Breyer, which is also a District of Maryland case, the passengers held a maritime lien. In rejecting an argument that the Breyer holding afforded the passengers a maritime lien, the court relied upon the distinguishing fact that in Breyer the cargo was loaded on board the vessel whereas in its case, as in the instant case, the passengers never boarded. The court reasoned that Breyer was "only a recognition of a long existing right of a claimant to sue in tort for damages resulting from the wrongful action of a common carrier with respect to passengers or cargo after they had physically come within the control of the carrier." Todd Shipyards, 83 F. Supp. at 76. This is simply to say that the duty of seaworthiness is not imposed by law, as opposed by contract, until a passenger boards the vessel or cargo is loaded.

In summary, Straight A asks the Court to extend the financial unseaworthiness cases to new factual circumstances in which the passengers have not boarded the vessel. The Court declines to do

so; instead, the Court adopts the analysis in Todd Shipyards. Because the passengers never boarded the *Mirage I*, the duty of seaworthiness never arose. Absent that duty, Straight A cannot make a claim for financial unseaworthiness and thereby convert its contract claim into a tort claim.

  E.  Unavailability of a Maritime Lien

Assuming Straight A a claim for fraud in the inducement akin to the "constructive fraud" theory raised in Breyer, Straight A's claim would still not be secured by a maritime lien. Again, Todd Shipyards is persuasive here:

> [E]ven if we assume that a common carrier may be sued in tort for failure to fulfill an executory obligation to a passenger who did not come within the care or control of the carrier it does not follow that a breach of such executory contract creates a lien in rem. Thus it may well be that the shipowner in the present case may be sued in tort by the prospective passengers either in civil law courts or even in personam in admiralty, but they have no maritime lien to enforce in rem against the ship. The shipowner, and not the ship as an entity, is the common carrier. The obligation to transport passengers either in accordance with a previous contract or advertised schedule is not the obligation of the vehicle used for transportation, but of the owner or operator of the vehicle.

Todd Shipyards at 76 (internal citations omitted). The Todd Shipyard court found the theoretical underpinnings of this distinction in two Supreme Court cases. In Osaka Shosen Kaisha v. Pacific Export Lumber Co., 260 U.S. 490 (1923), in determining that no lien arose where only part of a designated cargo was transported (and the remaining part was never loaded on board the vessel) the Court reasoned:

> The rule of admiralty, as always stated, is that the cargo is bound to the ship and the ship to the cargo. Whatever cases may have been decided otherwise disregarded the universal fact that no lien arises in admiralty except in connection with some visible occurrence relating to the vessel or cargo or to a person injured. This is necessary in order that innocent parties dealing with vessel may not be the losers by secret liens, the existence of which they have no possibility of detecting by any relation to any visible fact. It is in harmony with this rule that no lien lies in behalf of a vessel

>against her cargo for dead freight, or against a vessel for supplies contracted for, but not actually put aboard.

Id. at 500 (quoting The S.L. Watson, 118 F. 945, 952 (1st Cir. 1902)). See also Krauss Bros. Co. v. Dimon S.S. Corp., 290 U.S. 117, 121 (1933). Thus, until the passengers board the vessel, a maritime lien against a vessel cannot arise even if a tort claim can be established against its owners.

IV.     Conclusion

The Court concludes that Straight A's claims are unsecured. Taking Straight A's allegations to be true, the inescapable fact is that its intended passengers never boarded *The Mirage I*. Because of this inescapable fact, Straight A cannot establish that the requisite admiralty jurisdiction exists, that the duty of seaworthiness arose or that there existed the connection between the vessel and the passengers necessary to impose a maritime lien against the vessel for the torts of the Debtors. In sum, the Debtors are entitled to summary judgment on the Objection since Straight A's allegations, taken as true, fail to establish a maritime lien as a matter of law. Straight A's claims, whether sounding in contract or in tort, are simply unsecured claims. Therefore, it is-

**ORDERED** as follows:

1.     The Debtor's Motion for Summary Judgment is **GRANTED.**

2.     The Debtors' Objection is sustained and claims 44 and 72 filed by Straight A are disallowed as maritime lien claims. The claims will remain pending as general unsecured claims.

# # #

Copies Furnished To:

See attached service list.

<u>Service List</u>

Ronald G. Neiwirth, Esq.
Fowler, White, Burnett, P.A.
Espirito Santo Plaza, Fourteenth Floor
1395 Brickell Avenue, 1400
Miami, Florida 33131
Telephone: (305) 789-9200
Facsimile: (305) 789-9201

Patricia K. Olney
Patricia K. Olney, P.A.
677 Dave Nisbet Drive, Suite 110
Port Canaveral, FL 32920
Telephone: (321) 799-2575
Facsimile: (321) 799-1733

**(Attorney Neiwirth is instructed to serve a copy of this Order on all interested parties.)**